Filed 4/28/22  In re Reese CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re CLARENCE ERVIN REESE,<br><br>on Habeas Corpus. | B312440<br><br>(Los Angeles County<br>Super. Ct. No. BA230274) |

PETITION for writ of habeas corpus, Superior Court of Los Angeles County, George G. Lomeli, Judge.  Granted in part.

Nancy J. King, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

In 2004, a jury convicted petitioner Clarence Ervin Reese of first degree felony murder, attempted carjacking, and burglary, and found felony-murder special circumstance allegations true. Thereafter, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our California Supreme Court clarified under what circumstances a Penal Code section 190.2[1] special circumstance may be found true when the defendant is not the actual killer. Reese petitioned this court for a writ of habeas corpus, and we issued an order to show cause. We now conclude that the evidence was insufficient to prove Reese acted with reckless indifference to human life, and the special circumstance findings must be reversed.

**FACTUAL AND PROCEDURAL BACKGROUND[2]**

1. *People's evidence*

　　a. *The murder*

In January 2002, petitioner was 16 years old. Juan Roberto Saucedo was approximately 20, and went by the nickname "Negro." Both Reese and Saucedo were members of the Culver City gang.

Vuthipong Sanguansukdikosol and his family lived in a Los Angeles apartment building with a gated garage. On the afternoon of January 30, 2002, Sanguansukdikosol picked up his two sons, 11-year-old D. and 12-year-old K., from school and

---

[1]　　All further undesignated statutory references are to the Penal Code.

[2]　　At Reese's request, we have taken judicial notice of the records in *People v. Reese* (Mar. 2, 2007, B186147, nonpub. opinion) and *People v. Reese* (April 30, 2021, B301473, nonpub. opn.) (See Evid. Code, §§ 451, 452, 459.)

2

drove them home.  He used a remote control to open the garage gate.  The boys saw two males, identified through other evidence as Reese and Saucedo, standing on the sidewalk outside the garage, wearing hoods or hats.  They entered the garage through the gate as or after Sanguansukdikosol drove in.  D. and K. saw the youths go to the apartment manager's van, which was parked in its usual spot in the garage.  K. saw one of the men take something out of his pocket.

Sanguansukdikosol dropped the boys off at the garage elevator and told them to go upstairs and call their mother to let her know he was coming to pick her up.  Sanguansukdikosol began to turn his car around to exit the garage, and the boys took the garage elevator to the second floor.

Just after riding up the elevator, D. and K. heard a crash.  K. looked out the window and saw the two youths running out of the garage.  He went to the manager's apartment and told the manager about the men near the van.  The apartment manager, D., and K., went down to the garage, where the boys discovered their father lying in the car, which had crashed against the garage gate.  The driver's side door was closed, but the window was down.  K. tried to talk to his father, but he did not respond.  His seat belt was still on and the car was still running.  An ambulance was summoned for what was initially believed to be a heart attack.  Paramedics discovered Sanguansukdikosol had been shot.

The People presented evidence demonstrating Reese's and Saucedo's escape route, including the testimony of two eyewitnesses who observed portions of their flight.

Jose R., Rosemarie A., and Rosemarie's younger sister were driving in the area in Jose's white, two-door, convertible

3

Mustang, with the top down.  When Jose stopped the car to drop Rosemarie and her sister off at their home, Reese and Saucedo approached the vehicle's passenger side.  Saucedo patted his pockets and clothing as if to indicate he was unarmed.  The youths then jumped in the car, with Saucedo in the front passenger seat and Reese in the back.  Reese had a sweater wrapped around his arm, but neither Jose nor Rosemarie could tell if he was carrying anything under the sweater.

Saucedo demanded that Jose give them a ride for two blocks, because they had gotten in some trouble.  He said he was looking for one of his homeboys.  As Jose drove them away, Reese lay down in the back seat and asked him to put up the convertible's top.  Saucedo told Jose where to drive.  Jose asked where the men were from, and Saucedo replied that they were from the Culver City gang.  When Saucedo saw a dark car nearby, he waved to it and the men exited Jose's vehicle.

b.  *The investigation*

Sanguansukdikosol was killed by a single gunshot to his upper abdominal region, causing him to bleed to death.  The trajectory of the wound was consistent with the shooter standing outside the car and aiming from above.

The victim's glasses were found on the ground in the garage.  An expended casing found in the garage suggested the murder weapon was a semiautomatic firearm.

Rosemarie identified Reese as one of the men in a pretrial photographic lineup, at the preliminary hearing, and at trial.  Jose tentatively identified Reese in court as one of the men with 50 percent certainty.  At the preliminary hearing, he testified he was certain Reese was one of the men.

c. *Reese's statement to detectives*

Two detectives interviewed Reese on April 12, 2002. The interview was not recorded, but one of the detectives took detailed notes. Reese's account of events was as follows. On the date of the murder, Reese, Saucedo, and a fellow Culver City gang member with the nickname "Chubbs," met up in Culver City. Reese told detectives he "ran with [Saucedo] a lot," and had known him for a couple months. That afternoon, Chubbs drove Reese and Saucedo to Hollywood in Chubbs's girlfriend's black Honda. On the way to Hollywood the trio stopped at a mall and Reese purchased a video of the movie "The Fast and the Furious." Chubbs then dropped Saucedo and Reese off at the victim's garage.

Reese admitted that he and Saucedo were "on a mission" to steal a vehicle, and intended to take the stolen car back to their neighborhood. Reese was armed with a screwdriver to use to steal the car. Saucedo was to act as the lookout. Prior to or during the drive to Hollywood, Saucedo told Reese that he had a firearm in the car.

Reese and Saucedo entered the garage and discovered that some or all of the vehicles parked inside, including a van, had alarms. Saucedo said they could not be stolen. They then left the garage, but reentered when the victim drove in.[3] Saucedo said "let's get another car" or similar words, which Reese understood to mean Sanguansukdikosol's vehicle. Reese saw the two children at the elevator. He believed the victim had noticed him,

---

[3]     Some of Reese's statements alternatively suggested that he and Saucedo entered the garage only once, when Sanguansukdikosol opened the gate.

and wanted to leave.  However, Saucedo instructed him to take the victim's car.

Saucedo then approached Sanguansukdikosol with the gun in his right hand, held down by his leg.  At that point, the car was facing outward toward the gate.  Saucedo demanded that Sanguansukdikosol give him the car.  Sanguansukdikosol asked if Saucedo and Reese lived in the apartments.  When Saucedo demanded that Sanguansukdikosol get out of the car, Sanguansukdikosol said no, honked the horn, and yelled for the police.  Reese heard a gunshot.  Either before or after the shot, Saucedo unsuccessfully attempted to pull the victim from the car, and Sanguansukdikosol's glasses fell off.  Reese claimed he heard, but did not see, the actual shooting.  He stated that when Saucedo fired, he (Reese) was near the garage gate, and was leaving.  Saucedo told Reese to run, and the youths fled from the garage.

After the shooting Saucedo had the gun in his right hand and then put it in his waistband; Reese never took possession of it.  Reese described their escape route consistently with the two eyewitnesses who had observed them fleeing.  When they saw the white convertible, they jumped in, with Reese in the back.  Saucedo gave the driver instructions.  When they saw Chubbs's car they exited and the group drove back to their neighborhood.  At some point, Reese threw the screwdriver in the trash.  Saucedo, who still had the gun, told him not to talk to anyone about what had happened.  After arriving home, Reese went to a girl's house and watched the movie he had purchased.

Reese also gave a written statement to detectives, that read:  "Me and Negro had went into a driveway and I was going to steal a van with a screwdriver, and me and Negro was

confronted by a Chinese-looking man in [a] car.  Then we were going to leave when Negro told me to go.  Then I heard a shot and he said run, then we ran.  Negro had the gun, and then it [*sic*] says give me the car."

    2. *Procedure*

    A jury convicted Reese of first degree murder (§ 187, subd. (a)), attempted carjacking (§§ 664, 215, subd. (a)), and first degree burglary (§ 459).  It found true special circumstance allegations that the murder was committed while Reese was engaged in the commission of attempted carjacking and burglary. (§ 190.2, subd. (a)(17)(G), (L).)  It also found true allegations that a principal personally and intentionally used and discharged a firearm during the offenses, proximately causing the victim's death.  (§ 12022.53, subds. (b), (c), (d), (e)(1).)[4]

    The trial court exercised its discretion pursuant to section 190.5, subdivision (b), to sentence Reese to 25 years to life in prison rather than life without parole (LWOP).[5]  It reasoned that, although there was "significant and substantial evidence" to support the verdicts, mitigating factors existed.  Reese had turned 16 only 16 days before the murder; he was not the actual shooter; he was not "the architect of this plan and plot"; and his criminal history was nonviolent.

---

[4]    Section 12022.53 enhancements apply to a principal only if a gang enhancement is found true.  (§ 12022.53, subd. (e)(1)(A).) Because the People dismissed the gang enhancement allegations, the court vacated the jury's findings on the section 12022.53 allegations.

[5]    The sentences on the other counts were stayed pursuant to section 654.

In 2007, a different Division of this court affirmed Reese's judgment in a nonpublished opinion. (*People v. Reese, supra*, B186147.) Among other things, the court concluded that sufficient evidence supported the first degree murder verdict and the special circumstance findings. The California Supreme Court denied review.

On March 8, 2019, Reese filed a section 1170.95 petition in the superior court, seeking vacation of his murder conviction and resentencing. He argued that he had been tried on a felony-murder theory; he was not the actual killer and did not have the intent to kill; he was not a major participant in the crimes who acted with reckless indifference to human life; and he could not now be convicted of murder in light of amendments to sections 188 and 189. The trial court denied the petition. On April 30, 2021, in case No. B301473, a divided panel of this court affirmed the trial court's order, reasoning that the jury's true findings on the special circumstance allegations made Reese categorially ineligible for section 1170.95 relief.[6] (*People v. Reese* (Apr. 30, 2021, B301473) [nonpub. opn.].) We noted, however, that if Reese believed the evidence on the special circumstance findings was insufficient, his remedy was to bring a petition for writ of habeas corpus. (See *In re Scoggins* (2020) 9 Cal.5th 667, 673–674 (*Scoggins*).) We denied Reese's petition for rehearing without

---

[6]     Our Supreme Court subsequently granted review in case No. B301473. (July 14, 2021, S269236.) The court deferred further action pending resolution of *People v. Strong* (S266606, review granted Mar. 10, 2021), in which the court is considering whether a felony-murder special circumstance that predates *Banks* and *Clark* precludes a defendant from making a prima facie showing of eligibility for section 1170.95 relief.

prejudice to his right to file a new section 1170.95 petition, should he obtain habeas relief.

On May 17, 2021, Reese filed the instant habeas petition.

## DISCUSSION

Reese contends that, under *Banks* and *Clark*, the evidence was insufficient to prove he was a major participant in the underlying felony who acted with reckless indifference to human life. He seeks vacation of the special circumstance findings, remand for a hearing pursuant to section 1170.95, and vacation of his first degree murder conviction.

1. *The special circumstance statute, the* Enmund-Tison *continuum, and* Banks, Clark, *and* Scoggins

Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7.) Participating in a murder during an attempted carjacking or a burglary are two such circumstances. (§ 190.2, subd. (a)(17)(G), (L).) "For defendants who did not kill and lacked the intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*Douglas*, at p. 7; see *Scoggins*, *supra*, 9 Cal.5th at p. 674.) Section 190.2, subdivision (d) codifies the holdings of *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), which brought California law "into conformity with prevailing Eighth Amendment doctrine." (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393; *Banks*, *supra*, 61 Cal.4th at p. 794.)

*Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver

9

who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill. (*Enmund*, *supra*, 458 U.S. at pp. 798, 801; *Scoggins*, *supra*, 9 Cal.5th at p. 675.)

*Tison*, in contrast, did not preclude imposition of the death penalty for two defendants, brothers who had helped their father and his cellmate—both convicted murderers—escape from prison, and provided them with guns. (*Tison*, *supra*, 481 U.S. at p. 139.) When the group got a flat tire, one of the brothers flagged down a passing car for help. The group kidnapped at gunpoint the family of four that was in the car, robbed them, and drove them into the desert. The Tisons' father debated whether to kill the family. The sons stood by while the father and cellmate shot the victims repeatedly. The perpetrators left the family—which included a toddler and a teenager—to die in the desert, and drove off in the family's car. (*Id.* at pp. 139–141.) *Tison* held the Eighth Amendment does not prohibit imposition of the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at pp. 152, 157–158.)

In *Banks* and *Clark*, our Supreme Court clarified the meaning of the "major participant" and "reckless indifference to human life" requirements. *Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant[.]" (*Banks*, *supra*, 61 Cal.4th at p. 794.) The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the

10

defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

*Banks* found insufficient evidence to show the defendant there—a getaway driver for an armed robbery—was a major participant or acted with reckless indifference.  (*Banks*, *supra*, 61 Cal.4th at pp. 805, 807–808.)  No evidence established his role in planning the robbery or procuring the weapons; during the robbery and murder he was absent from the scene, sitting in a car and waiting; and no evidence showed he had any role in instigating the shooting, or could have prevented it.  (*Id.* at p. 805.)  He was "no more than a getaway driver," like Enmund. (*Ibid.*)

In *Clark*, the court turned its attention to the "reckless indifference" determination.  (*Clark*, *supra*, 63 Cal.4th at p. 611.)  Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.]" (*Clark*, at p. 616, quoting *Tison*, *supra*, 481 U.S. at p. 157.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.)  Recklessness has both a subjective and an objective component.  Subjectively, the defendant must consciously disregard risks known to him.  Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's

11

conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' [Citation.]" (*Ibid.*) The fact a robbery involved a gun or carried a risk of death is insufficient, by itself, to support a finding of reckless indifference. (*Id.* at pp. 617–618.)

*Clark*, like *Banks*, listed various factors to be considered when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, *supra*, 63 Cal.4th at pp. 618–623].)

Based on these factors, *Clark* concluded that the defendant there did not act with reckless indifference. (*Clark*, *supra*, 63 Cal.4th at p. 623.) Although he was the "mastermind" who planned a computer store robbery during which a victim was shot and killed, he was not armed, was not physically present in the store when the shooting occurred, and had attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present, and planning on use of an unloaded gun. (*Id.* at pp. 612, 618–623.)

Our Supreme Court again considered the reckless indifference inquiry in *Scoggins*, *supra*, 9 Cal.5th 667. *Scoggins* found an insufficient showing of reckless indifference where the

defendant planned an unarmed assault and robbery, in which one of his accomplices deviated from the plan and unexpectedly killed the victim.  Scoggins was not present at the scene, was not in a position to restrain his accomplices, did not know a gun would be used or plan that the victim would be killed, attempted to minimize the risk of death by ordering the assault to occur in a public place in broad daylight, and acted ambiguously after the shooting.  (*Id.* at pp. 677–683.)

     2.  *Scope of review*

A defendant whose special circumstance determination predated *Banks* and *Clark* may challenge the sufficiency of the evidence of the finding by means of a habeas corpus petition.  (*Scoggins*, *supra*, 9 Cal.5th at pp. 673–674.)  "Where a decision clarifies the kind of conduct proscribed by a statute, a defendant whose conviction became final before that decision 'is entitled to post-conviction relief upon a showing that his [or her] conduct was not prohibited by the statute' as construed in the decision.  [Citation.]  'In such circumstances, it is settled that finality for purposes of appeal is no bar to relief, and that habeas corpus or other appropriate extraordinary remedy will lie to rectify the error[.]' "  (*Ibid.*)

"When a defendant seeks habeas corpus relief, the underlying judgment is presumed valid" (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1018), and we view the facts favorably to the prosecution (*In re Parrish* (2020) 58 Cal.App.5th 539, 541).  "In a habeas corpus challenge to the sufficiency of the evidence to support a special circumstance finding, the 'standard of review . . . is whether, when evidence that is reasonable, credible, and of solid value is viewed "in the light most favorable to the prosecution, any rational trier of fact could have found the

13

essential elements of the allegation beyond a reasonable doubt."
[Citations.] The standard is the same under the state and federal
due process clauses. [Citation.] We presume, in support of the
judgment, the existence of every fact the trier of fact could
reasonably deduce from the evidence, whether direct or
circumstantial.' " (*In re Bennett*, at p. 1018; *In re McDowell*
(2020) 55 Cal.App.5th 999, 1008.)

Determination of whether the evidence demonstrates
reckless indifference and major participation is a "fact-intensive
and individualized inquiry" (*In re Parrish*, *supra*, 58 Cal.App.5th
at p. 542) in which we consider the totality of the circumstances
(*Scoggins*, *supra*, 9 Cal.5th at p. 677). The *Banks* and *Clark*
factors overlap, and " '[n]o one of these considerations is
necessary, nor is any one of them necessarily sufficient.' " (*Clark*,
*supra*, 63 Cal.4th at pp. 615, 618; *Banks*, *supra*, 61 Cal.4th at
p. 803.) Reese "is entitled to habeas corpus relief ' "if there is no
material dispute as to the facts relating to his conviction and if it
appears that the statute under which he was convicted did not
prohibit his conduct." ' [Citation.]" (*Scoggins*, at p. 676.)

Because this court's 2007 opinion was issued without the
benefit of *Banks*, *Clark*, and *Scoggins*, we do not limit our review
to the facts stated in our prior opinion, but consider the entire
record. (*In re Taylor* (2019) 34 Cal.App.5th 543, 556–557.)

3. *Reese's petition is not procedurally barred*

We first address the People's contention that Reese's
habeas petition is procedurally barred because of his unjustified
delay in filing it.

A criminal defendant mounting a collateral attack on a
final judgment of conviction must do so in a timely manner, that
is, without substantial delay. (*In re Reno* (2012) 55 Cal.4th 428,

14

459; *In re Taylor, supra*, 34 Cal.App.5th at p. 555.) California law does not set a specific time limit; instead, we apply a general reasonableness standard to determine timeliness. (*In re Reno*, at p. 461.) The "basic issue is whether [the petition] was ' " 'filed as promptly as the circumstances allow.' " ' " (*In re Taylor*, at p. 555.) "Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim." (*In re Robbins* (1998) 18 Cal.4th 770, 780.) A claim that is substantially delayed will nevertheless be considered on the merits if the petitioner can demonstrate good cause for the delay. (*Id.* at p. 805; *In re Reno*, at p. 460.)

The People argue that Reese's judgment was final in 2007. *Banks* and *Clark* were issued on July 9, 2015 and June 27, 2016, respectively. Reese's habeas petition was filed on May 17, 2021. Therefore, the People contend, the delay between—at the very latest—the *Clark* decision and the instant petition was unreasonable. Reese counters that Senate Bill No. 1437 (2018–2019 Reg. Sess.) (Senate Bill 1437) did not take effect until January 1, 2019 and, because the law is unsettled regarding whether a special circumstance may be challenged via a section 1170.95 petition, any delay is justified.

Reese has the better argument. While procedural bars protect society's interest in the finality of criminal judgments, "[t]his purpose loses some of its force in cases, such as petitioner's, that may be affected by the Legislature's enactment . . . of section 1170.95." (*In re Ramirez, supra*, 32 Cal.App.5th at p. 406, fn. 11.) As a practical matter, Reese's claim does not arise solely from *Banks* and *Clark*. The function of the special circumstance findings in Reese's case was to allow for an LWOP

15

sentence. But, because of Reese's age, the trial court exercised its discretion *not* to impose an LWOP sentence. Instead, it imposed a term of 25 years to life, the same sentence Reese would have received even had the special circumstance been found *not* true. (See § 190, subd. (a).) Thus, until passage of Senate Bill 1437, reversal of the special circumstance findings would have had no effect on Reese's sentence and no practical effect on his judgment.

Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959.) Prior to Senate Bill 1437's enactment, under the felony-murder rule "a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state."[7] (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–248.) Senate Bill 1437 added section 189, subdivision (e). As amended, "section 189 limits the first degree felony-murder rule by imposing new requirements for its application. The statute provides that, unless the victim is a peace officer killed in the line of duty, a defendant cannot be liable for first degree felony murder unless the defendant was the actual killer, acted with intent to kill, or was a major participant in the underlying felony and acted with reckless indifference to human life." (*People v. Eynon* (2021) 68 Cal.App.5th 967, 974.)

Senate Bill 1437 also added section 1170.95, which created

---

[7] Reese's case was tried on this theory and his jury was so instructed.

16

a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences theory may petition for vacation of their convictions and resentencing. A defendant is eligible for relief if he could no longer be convicted of murder due to changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1170.95, subd. (a).)

Where a court determines in a habeas proceeding that the evidence was insufficient to prove major participation/reckless indifference, the defendant is entitled to relief under section 1170.95, subdivision (d)(2). That subdivision imposes "a mandatory duty on the court to vacate defendant's sentence and resentence him whenever there is a prior finding of this court that the defendant was not a major participant in the underlying felony and did not act with reckless indifference to human life." (*People v. Ramirez* (2019) 41 Cal.App.5th 923, 932.)

The thrust of Reese's habeas petition is that, because the evidence was insufficient to prove he was a major participant who acted with reckless indifference, he can no longer be convicted of first degree murder under current law as amended by Senate Bill 1437.[8] Only after enactment of Senate Bill 1437 could Reese have known that *Banks* and *Clark*, in combination with newly enacted section 1170.95, gave rise to a legal basis for the relief he

---

[8] Reese's petition states that his claims are based on the record on appeal in both the original case and in the subsequent appeal of the denial of his section 1170.95 petition. He seeks reconsideration of his section 1170.95 petition as well as vacation of the special circumstance findings and his murder conviction, arguing that because the evidence is insufficient to support the special circumstance findings, it is also insufficient to support his murder conviction under current law.

17

seeks. Any delay must therefore be measured from January 1, 2019. (See *In re Robbins*, *supra*, 18 Cal.4th at p. 780.)

Reese filed a section 1170.95 petition on March 8, 2019, less than three months after Senate Bill 1437's effective date. Thus, he promptly sought relief under the new law. The instant habeas petition was not filed until May 17, 2021. But, there is a split of authority regarding whether a major participant/reckless indifference finding may be challenged in a section 1170.95 petition, or only in a habeas petition. (See, e.g., *People v. Price* (2021) 71 Cal.App.5th 1128, 1146–1147, review granted on another point on Feb. 9, 2022, S272572.) As noted *ante*, the issue is currently being considered by our California Supreme Court. (*People v. Strong*, *supra*, S266606.) Given this unsettled state of the law, we cannot say Reese unreasonably delayed by initially choosing to pursue relief via a section 1170.95 petition, rather than via a habeas petition.

Moreover, a court will consider the merits of a claim presented after substantial delay even without good cause if it falls within certain narrow exceptions. Two such exceptions are relevant here: (1) the petitioner is actually innocent of the crime or crimes of which he was convicted; and (2) the petitioner was convicted or sentenced under an invalid statute. (*In re Reno*, *supra*, 55 Cal.4th at p. 460; *In re Robbins*, *supra*, 18 Cal.4th at pp. 780–781.) Reese's claims are that under current law, he is actually innocent of the crime of murder, and that the former felony-murder rule is now invalid.

In sum, the petition is not procedurally barred.

4. *The evidence was insufficient to establish Reese acted with reckless indifference to human life*

Considering the totality of the circumstances in the light most favorable to the prosecution, we cannot conclude, given our Supreme Court's clarifications in *Banks* and *Clark*, that the evidence was sufficient to show Reese acted with reckless indifference to human life.[9] As we have observed, the *Banks* and *Clark* factors overlap. (*Clark, supra,* 63 Cal.4th at pp. 614–615.) Accordingly, we consider both. First, while Reese admittedly planned to burglarize the garage and steal a car using a screwdriver, there was no evidence he planned a carjacking. Instead, the carjacking seems to have been a spontaneous, spur of the moment deviation from the original scheme by Saucedo, once the youths discovered the manager's van—and possibly other vehicles in the garage—had alarms. As the trial court opined at sentencing, "I do not believe the defendant was the architect of this plan and plot. I think the evidence has established that the defendant was a soldier. He was a lieutenant." For purposes of establishing reckless indifference, there is a significant difference between planning to steal an unoccupied car, and planning to carjack one occupied by a victim.

The People argue that Reese told detectives he and Saucedo examined the vehicles in the garage, left the garage, and then reentered when the victim opened the gate. From this they infer that the carjacking was not spontaneous. We disagree. The victim's children testified that they saw both youths around the manager's van after their father drove through the gate,

---

[9]     We therefore do not address whether the evidence was sufficient to prove Reese was a major participant.

19

suggesting that Reese and Saucedo were still attempting to find an unoccupied vehicle to steal at that point and the carjacking was an impulsive reaction when that endeavor failed. But, even if Reese and Saucedo had already determined that the cars in the garage were not attractive theft targets, and reentered thereafter to take Sanguansukdikosol's car, this does not amount to evidence that Reese, as opposed to Saucedo, planned or instigated the carjacking.

The evidence regarding weapon use likewise provides little support for a finding of reckless indifference. Reese was equipped with a screwdriver, not a gun. While a screwdriver can be used as a stabbing instrument, no evidence showed that was Reese's intention here. His statements to the detectives suggested he intended to use it to break into a car, and there was no evidence he attacked or menaced the victim with it. Only one gun—that wielded by Saucedo—was used, and there was no evidence Reese supplied it. Nor was there any evidence that Reese instructed Saucedo to use lethal force. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 988; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [although defendant was aware that his accomplice had a gun, defendant did not supply it and did not use a gun himself].)

Certainly, Reese knew Saucedo had a gun; Saucedo told him so at least by the time they were driving to Hollywood. But there was no evidence Reese knew Saucedo planned on actually using it. Indeed, since Reese's plan was to steal an unoccupied car, there would have been little reason to expect violence. (See *In re Taylor*, *supra*, 34 Cal.App.5th at pp. 557–558 [even assuming there was substantial evidence defendant knew his accomplice was armed, "there is little about [defendant's] use or knowledge of firearms that suggests he appreciated the planned

20

robbery posed a heightened risk of death"]; *Scoggins, supra*, 9 Cal.5th at p. 677 [fact Scoggins did not know his accomplice would use a gun suggested he was "far less culpable" than the Tison brothers].) Until moments before the murder, Saucedo did nothing to indicate he was contemplating using lethal force. (See *Scoggins*, at p. 678 [where " 'the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force,' " the " ' "defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state . . . ." ' "].)

And, most significantly, " 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." ' (*Scoggins, supra*, 9 Cal.5th at p. 677; *Clark, supra*, 63 Cal.4th at p. 618 ["The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life."]; *Banks, supra*, 61 Cal.4th at p. 809 [awareness that confederates are armed and armed robberies carry a risk of death does not by itself demonstrate reckless indifference]; *People v. Ramirez, supra*, 71 Cal.App.5th at p. 988 [defendant's awareness that accomplice had a gun and intended to use it during a carjacking was not sufficient to prove reckless indifference]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1088 ["knowledge of the possible risk of death inherent in certain felonies like armed robbery does not satisfy the reckless indifference standard."]; *In re Bennett, supra*, 26 Cal.App.5th at p. 1016.) Thus, even assuming Reese knew Saucedo intended to commit a carjacking with a gun when they entered or reentered the garage, this fact does not, by itself, establish the requisite mental state.

Moving to the next factor, there was no evidence Reese knew Saucedo was prone to violence or was likely to use lethal force. Reese told detectives he had known Saucedo for a couple months and "ran with" him a lot. But nothing suggested he and Saucedo had previously committed crimes together, or that Saucedo had previously committed a shooting or other violent offense. The youths were members of the same gang, but there was no evidence of the gang's activities and no showing Saucedo had engaged in gang-related violence. (See *Banks*, *supra*, 61 Cal.4th at pp. 810–811 [although some of getaway driver's cohorts in armed robbery were gang members, there was no evidence they had participated in shootings, murder, or attempted murder]; *In re Miller* (2017) 14 Cal.App.5th 960, 976 [although defendant and the killer belonged to the same gang and had committed follow-home robberies together, no evidence indicated they had ever participated in shootings, murder, or attempted murder]; *In re Taylor*, *supra*, 34 Cal.App.5th at p. 558 [no evidence defendant was aware of his accomplice's propensity for violence, despite knowledge of accomplice's involvement in illegal activity including drug sales]; *In re Ramirez*, *supra*, 32 Cal.App.5th at p. 405.)

The "duration of the crime also counsels against finding defendant exhibited reckless indifference to human life." (*In re Miller*, *supra*, 14 Cal.App.5th at p. 975.) "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation] possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620; *Scoggins*, *supra*, 9 Cal.5th at p. 680 [prolonged restraint of the victim can indicate reckless indifference to human life, because it provides a greater

opportunity for violence].) Here, the duration of the incident was extremely brief. K. testified that only two or three minutes elapsed between the time he entered the garage elevator until he heard the crash that indicated the fatal shot had been fired. (See *Scoggins*, *supra*, 9 Cal.5th at p. 681 [fact interaction with victim lasted only up to five minutes, rather than a prolonged period, did not weigh in favor of reckless indifference finding].)

Evidence that a defendant had the opportunity to act as a restraining influence on his murderous cohort, but failed to do so, provides support for a reckless indifference finding. (See *Scoggins*, *supra*, 9 Cal.5th at p. 678; *In re Loza* (2017) 10 Cal.App.5th 38, 53–54.) But there is weak evidence Reese had such an opportunity here. The entire incident transpired rapidly and the carjacking was a spontaneous deviation from the planned auto theft. Reese told detectives that, believing that the victim had seen him, he was near the gate and leaving the garage when Saucedo approached the victim, holding the gun down by his side. Reese claimed he did not see the actual shooting and was not by Saucedo's side when Saucedo fired the fatal shot. Thus, although Reese was in close proximity to the shooting, it does not appear he was close enough, nor was there sufficient time, for him to act as a meaningful restraining influence. (See *People v. Ramirez*, *supra*, 71 Cal.App.5th at p. 989 [defendant lacked meaningful opportunity to intervene when he and the shooter were on opposite sides of the carjack victim's vehicle, and the attempted carjacking was quickly executed].)

*Clark* and other authorities have also considered a defendant's efforts to minimize the risks of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 621–622.) Here, this factor appears neutral. Reese planned for a car theft, a crime

that does not generally involve violence. The carjacking was carried out on the spur of the moment, by Saucedo. The People argue that the carjacking transpired in the afternoon, when children were getting out of school. But the crime occurred in an apartment garage, not a school parking lot; other than the victim's sons, there were no children and no other persons in the garage when Reese and Saucedo entered. And, Saucedo waited to commit the carjacking until the children had gotten into the elevator. The evidence suggests Reese neither took steps to minimize the risk of violence, nor heighten it.

Two factors provide some support for a finding of reckless indifference. Courts have relied on a defendant's failure to aid a wounded victim as a factor showing reckless indifference. (See *Clark*, *supra*, 63 Cal.4th 619; *In re Parrish*, *supra*, 58 Cal.App.5th at p. 544 [reckless indifference shown in part by fact petitioner "did not pause . . . to aid or comfort the victim"]; *People v. Douglas*, *supra*, 56 Cal.App.5th at p. 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].) Here, Reese did nothing to aid Sanguansukdikosol. But, this failure is mitigated somewhat because it is unclear whether Reese knew Sanguansukdikosol had actually been shot, or how badly he was hurt. Reese claimed he did not see the actual shooting, and simply ran on Saucedo's command. An ambulance was summoned for Sanguansukdikosol for a heart attack, not a gunshot wound, indicating the nature of the wound was not immediately obvious. (See *In re Taylor*, *supra*, 34 Cal.App.5th at p. 559 [failure to assist victim did not support reckless indifference finding where there was no evidence defendant appreciated how badly the victim was wounded].) The fact Reese

24

later watched the movie he had purchased is not sufficiently callous to reliably demonstrate recklessness.

The strongest factor weighing in favor of a reckless indifference finding is Reese's presence at the crime scene. "Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 148; *People v. Murillo* (2020) 54 Cal.App.5th 160, 172–173, review granted on another ground Nov. 18, 2020, S264978.) Indeed, in the majority of cases finding an absence of reckless indifference, the defendant was not present. (See *Murillo*, at pp. 172–173 ["In *Banks* and *Clark*, and in other cases in which a court has overturned a special circumstance finding, the defendant either was not present at the scene of the killing, or at least was not capable of preventing his cohort from acting."].)

However, this factor is not always dispositive. (See *People v. Ramirez*, *supra*, 71 Cal.App.5th at pp. 975, 978, 989 [concluding defendant who was present when accomplice shot the victim did not act with reckless indifference]; *In re Moore*, *supra*, 68 Cal.App.5th at p. 452 [although petitioner saw accomplice rob and shoot the victim, petitioner was sitting in a stolen car at the scene and was not close enough to exercise a restraining effect].)

*People v. Ramirez* is analogous. There, the 15-year-old defendant and two fellow gang members, Rios and Gallardo, set out to carjack a victim. Ramirez knew the leader, Rios, was armed with a gun. (*People v. Ramirez*, *supra*, 71 Cal.App.5th at pp. 977, 979.) When the victim of the carjacking declined to exit his car at Rios's command, Rios shot and killed him. Ramirez admitted to police that he knew Rios was planning the carjacking. Ramirez also admitted approaching the car and

25

telling the passenger to get out. He had not wanted to participate in the carjacking but felt he had to or Rios would tell his fellow gang members and he would be killed. (*Id.* at pp. 978–979, 981.) The court reasoned: "Ramirez did not provide the murder weapon, instruct his confederate to shoot, or know of his confederate's propensity toward violence, and the shooting occurred quickly without Ramirez having a meaningful opportunity to intervene. Although Ramirez was aware his confederate had a gun and intended to use it in the carjacking, as a 15 year old he may well have lacked the experience and maturity to appreciate the risk that the attempted carjacking would escalate into a shooting and death, and he was more susceptible to pressure from his fellow gang members to participate in the carjacking. Thus, there is not substantial evidence Ramirez acted with reckless indifference to human life." (*Id.* at p. 975.) Similar circumstances are present here, and likewise are insufficient to demonstrate reckless indifference.

Finally, as in *Ramirez*, Reese's youth weighs against a finding of reckless indifference. At the time of the murder, Reese was barely 16 years old, his birthday having occurred only 16 days earlier. Youth was not one of the factors expressly listed by *Banks* and *Clark*, but those opinions did not purport to set forth an exclusive list. (*In re Harper* (2022) 76 Cal.App.5th 450, 466–467.) Several courts have concluded that a defendant's youth is a relevant factor in the major participant or reckless indifference inquiry. In the context of reviewing a denial of a section 1170.95 petition at the prima facie stage, *People v. Harris* concluded the evidence did not show, as a matter of law, that the 17-year-old arson defendant was actually aware of the particular dangers of throwing firebombs into a residence, "particularly in light of

26

subsequent case law's recognition of the science relating to adolescent brain development [citations]." (*People v. Harris* (2021) 60 Cal.App.5th 939, 959–960, review granted on another point Apr. 28, 2021, S267802.)

In *In re Moore*, *supra*, 68 Cal.App.5th 434, the court found age was a determinative factor in the reckless indifference inquiry. (*Id.* at pp. 453–454.) There, the petitioner was 16 years old when the murder was committed. The court concluded that even if the evidence showing reckless indifference would have been sufficient for an adult, it did not suffice for the petitioner due to his age. The court reasoned that children are generally less mature and responsible than adults, and the law has historically assumed that they lack the capacity to exercise mature judgment. Accordingly, the court concluded the petitioner lacked the experience, perspective, and judgment to adequately appreciate the risk of death posed by his participation in a robbery-homicide. (*Ibid*.)

*People v. Ramirez*, *supra*, 71 Cal.App.5th 970, similarly concluded that a "juvenile's immaturity and failure to appreciate the risks and consequences of his or her actions bear directly on the question whether the juvenile is subjectively ' "aware of and willingly involved in the violent manner in which the particular offense is committed" ' and has 'consciously disregard[ed] "the significant risk of death his or her actions create." ' " (*Id.* at p. 991.) The court pointed out that both the California and United States Supreme Courts have observed that the hallmark features of youth include immaturity, impetuosity, and the failure to appreciate risks and consequences, and juveniles are more susceptible to peer pressure than adults. (*Ibid.*) The court concluded, "Ramirez's youth at the time of the shooting greatly

27

diminishes any inference he acted with reckless disregard for human life by participating in the attempted carjacking knowing Rios was armed." (*Id.* at pp. 990–991.)

In *In re Harper*, the court criticized *In re Moore* for suggesting, "with little or no analysis," that "the defendant's youth, by itself, was the *decisive* factor in determining whether the defendant acted with reckless disregard for human life." (*In re Harper*, *supra*, 76 Cal.App.5th at p. 468.) *Harper* declined to follow *Moore* "to the extent it can be read to suggest that youth is, by itself, a *decisive* factor whenever the defendant was a minor at the time of the offense." (*Id.* at p. 470.) Assuming, without deciding, that youth was a factor that might be considered, *Harper* concluded it was not dispositive in that case. (*Id.* at p. 466.)

We need not weigh in on whether *Harper*'s criticism of *Moore* is warranted. In evaluating the evidence, we must examine the totality of the circumstances (*Scoggins*, *supra*, 9 Cal.5th at p. 677), and it cannot be denied that a defendant's youth is potentially relevant to his mental state and his assessment of the risks involved in a criminal endeavor. Here, Reese was barely 16 years old when he committed the offenses. The evidence suggested that 20-year-old Saucedo, who was a member of the same gang, was the leader and gave the considerably younger Reese directions: Saucedo told Reese which cars were undesirable theft targets, and directed Reese to take the victim's car. When the duo fled, Saucedo, not Reese, did all the talking and gave directions to Jose. There was little, if anything, about the planned vehicle theft and even the carjacking that would have suggested to a person as young as Reese that the crimes involved a heightened risk of death. As *Ramirez*

28

explained, the defendant's "age may well have affected his calculation of the risk of death posed by using the firearm in the carjacking, as well as his willingness to abandon the crime." (*People v. Ramirez, supra*, 71 Cal.App.5th at p. 991.) Accordingly, Reese's age cuts against a finding that he was subjectively aware his actions created a grave risk of death beyond that inherent in any violent felony.

In sum, viewing the evidence in the light most favorable to the People and taking into consideration *Banks*, *Clark*, *Scoggins*, and their progeny, we cannot say the evidence was sufficient to prove Reese acted with reckless indifference to human life.[10]

The People argue that Reese's statements to police were internally contradictory and self-serving, supporting the conclusion that he was minimizing his own involvement in the crimes. They contend that evidence he had a sweater wrapped around his hand when he entered Jose's convertible supports an inference he was hiding the gun, which in turn supports an inference that he had it because he fired the fatal shot. But assuming the gun was under the sweater, this is too slender a reed upon which to base a conclusion that Reese was the shooter. The only evidence regarding what transpired in the garage after the children went upstairs came from Reese, and he consistently

---

[10] This Division's 2007 opinion concluded the evidence was sufficient to prove Reese acted as a major participant with reckless indifference, based primarily on the fact Saucedo was armed with a firearm. But, as we have discussed, our Supreme Court has since made clear that the mere presence of a firearm— and, indeed, the foreseeable risk of death in an armed robbery— is insufficient to prove reckless indifference. (*Scoggins, supra*, 9 Cal.5th at p. 677; *Banks, supra*, 61 Cal.4th at p. 808; *Clark, supra*, 63 Cal.4th at pp. 617–618.)

29

claimed Saucedo was the shooter. One of the eyewitnesses who observed Reese and Saucedo running from the scene saw that the taller man—i.e., Saucedo—had his hand in his pants pocket and was running clumsily.[11] When Reese and Saucedo reached Jose's convertible, Saucedo patted his clothing as if to demonstrate he was unarmed, and Reese had the sweater wrapped around his arm. From this evidence the jury could perhaps have inferred that Saucedo gave the gun to Reese to hold during their flight. But the inference that Reese was therefore the shooter is simply too speculative to amount to substantial evidence. As the prosecutor told the jury during opening statement, "you may never know exactly what happened," except that "one of the two of them shot and killed" the victim. The trial court, at sentencing, stated, "I do not believe the defendant was the shooter . . . ." Certainly, Reese's statements to detectives may not have been entirely truthful. But given that there was no significant circumstantial evidence contradicting Reese's claim that Saucedo was the shooter, the fact he may have been partially dishonest does not equate to sufficient evidence on this question.

---

[11] Reese was approximately five foot five inches tall. Saucedo was approximately six feet tall.

## DISPOSITION

The petition for writ of habeas corpus is granted in part. The special circumstance findings are vacated. The matter is remanded to the trial court for consideration of a new section 1170.95 petition, should Reese file one. Upon consideration of such a petition, the court is directed to vacate Reese's murder conviction pursuant to section 1170.95, subdivision (d)(2), and resentence him on the attempted carjacking and burglary convictions in accordance with section 1170.95.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

31